UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANE DOE,<br>    Plaintiff, | |
| v. | No. 3:10-cv-1171 (SRU) |
| NORWICH FREE ACADEMY,<br>    Defendant. | |

### RULING ON PLAINTIFF'S MOTION FOR RECONSIDERATION

Plaintiff Jane Doe ("Doe") brought this employment discrimination action against her former employer, defendant Norwich Free Academy ("NFA").[1]  On July 2, 2012, I granted summary judgment in favor of NFA on all claims.  Shortly thereafter, Doe filed a motion for reconsideration (doc. # 51).  Specifically, Doe seeks reconsideration of my ruling on her disability discrimination claims brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA").  For the reasons set forth below, Doe's motion for reconsideration is DENIED.

---

[1] Doe originally brought claims for wrongful termination; gender and sexual orientation discrimination under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA"); disability discrimination under the CFEPA; gender discrimination under Title VII of the Civil Rights Act of 1964; disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); and free speech violations under Conn. Gen. Stat. § 31-51q.  *See* Compl. (doc. # 1).  On January 4, 2011, NFA moved to dismiss Doe's wrongful termination and section 31-51q claims  (doc. # 15).  I granted NFA's motion to dismiss with respect to Doe's wrongful termination claim, but denied the motion with respect to Doe's section 31-51q claim (doc. # 25).  Doe later voluntarily withdrew her Title VII and CFEPA claims alleging gender and sexual orientation discrimination.  Thus, at the July 2, 2012 hearing, the only claims remaining were the section 31-51q claim and the disability discrimination claims under the ADA and the CFEPA.

I.      **Factual Background**

The facts set forth below are taken from the parties' Local Rule 56(a) Statements (docs. # 31-9 and # 38) and supporting affidavits.  The facts are undisputed unless otherwise indicated.

Doe was a campus security officer employed by NFA, a private comprehensive school located in Connecticut.  Doe has been diagnosed with a thyroid condition known as Hashimoto's Hypothyroidism.  The director of campus safety, Al Fecteau, was aware of this condition.  Symptoms of this condition can include extreme fatigue, depression, bad skin, hair loss, constipation, anxiety, heart palpitations, sweats, shaking, intestinal distress, and crying jags.  *See* Jane Doe Dep., at 32, attached as Ex. 1 to Pl.'s Opp'n to Summ. J. (doc. # 37).  Doe's thyroid condition did not cause her to miss any work, nor did she believe that it required a change in her working conditions.

On June 15, 2009, Doe learned that her nephew, a senior at NFA, was banned from participating in the school's graduation ceremonies because of an alcohol violation at the school prom.  Doe became angry with two NFA officials — John Iovino, the director of student affairs, and Sean Campbell, the house administrator — who were purportedly responsible for her nephew's discipline.  That day, Doe spoke with Fecteau regarding her nephew's punishment.  She complained that her nephew was the victim of disparate treatment, and also stated that she wondered why nothing that goes on at the school is ever reported in the newspapers.  Doe cited two specific incidents:  (1) a former coach allegedly having an inappropriate relationship with a student in 2005; (2) a handgun being brought on campus in 2006.  *See* Def.'s Local Rule 56(a)(1) Statement, at ¶ 5.  Doe had been told to keep both incidents confidential.

The next day, on June 16, 2009, Doe began experiencing extreme anxiety and took herself to the NFA nurse's office.  There, she was visited by Kevin Rodino, the assistant director

2

of campus security and her supervisor. Doe reiterated the same complaints concerning the disparate treatment of her nephew and the lack of news coverage of what goes on at the school. Rodino then called Lucinda Finger, the director of finance and human resources, to speak with Doe regarding enrolling her in NFA's employee assistance program. While Doe spoke with Finger, she told her that she "felt like she wanted to kick John Iovino in the balls." *Id.* ¶ 7. Following her anxiety attack, Doe took the rest of the week off of work and was given sick leave through the last day of school. Doe later claimed that her anxiety that day was caused by a "thyroid storm."

After leaving NFA on June 16, 2009, Doe called her brother and expressed her frustration. During the conversation, Doe revealed to her brother information about the former softball coach's inappropriate relationship with a student in 2005, as well as the incident involving a student bringing a gun to campus in 2006. The plaintiff admits that she had been specifically told not to discuss either incident. *Id.* ¶¶ 9-11.

On July 7, 2009, Fecteau called Doe into a meeting where he informed her that she was being terminated. Fecteau stated that the school had investigated Doe's comment to Finger regarding Iovino, and came to the conclusion that she had violated the zero tolerance policy against threats of violence in the workplace. *Id.* ¶ 16. NFA's violence prevention policy states, in all capital letters and bold type, "There will be zero tolerance of acts or threats of violence in our workplace by employees." *Id.* ¶ 13. Acts of violence or threats are defined as "[a] threat of immediate or future harm, made seriously or in jest, whether verbally, in writing or by an employee's conduct or physical gesturing" and "[a]ny implied threat, made seriously or in jest, made either verbally or by an employee's conduct or physical gesturing, that a reasonable person would construe as coercive, intimidating or menacing." *Id.* (quoting Staff Handbook, at 13-14,

16, attached as Ex. D to Def.'s Mot. for Summ. J. (doc. # 31-5)). Remedies for violations of the workplace violence prevention policy range from oral reprimand to suspension and/or immediate termination. *Id*.

Fecteau also told Doe that she had breached the school's confidentiality by threatening to go to the newspapers about incidents at the school and sharing information with her brother. *Id*.

¶ 16. Doe had previously signed a confidentiality policy which stated in part:

> As an employee of The Norwich Free Academy, you have access to confidential information. Confidentiality is to be observed and respected at all times both within and outside the office. Your employment with the Academy assumes an obligation to maintain confidentiality, even after you leave our employ. Discussions of confidential information must take place in private settings away from members of the public. You must not discuss or reveal confidential information except when such disclosure is made in the ordinary course of your duties . . . Because of its seriousness, disclosure of confidential information can lead to discipline, up to and including termination and/or legal action.

*Id.* 14-15 (quoting Staff Handbook, at 5). In its termination letter, NFA explained that Doe was being terminated based on her "behavior following the decision by NFA to prohibit [her] family member from participating in graduation ceremonies." Compl., at ¶ 15. Doe then filed this suit on July 26, 2010, alleging, *inter alia*, violations of the ADA and the CFEPA.

## II.     Standard of Review

The standard for granting motions for reconsideration is strict. Motions for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Motions for reconsideration will not be granted where the party merely seeks to re-litigate an issue that has already been decided. *Id.* The three major grounds for granting a motion for reconsideration are: (1) an intervening change of controlling law, (2) the

availability of new evidence, or (3) the need to correct a clear error or prevent manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing 18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 4478).

### III.     Discussion

Doe moves for reconsideration of my oral ruling granting summary judgment in favor of the defendant on her ADA and CFEPA disability discrimination claims.[2] However, Doe has not introduced any controlling law or particular fact that I overlooked in considering her opposition to summary judgment, nor has she otherwise indicated a clear error or manifest injustice requiring reconsideration. Rather, Doe's motion is merely an attempt to relitigate issues previously decided, and therefore lacks merit. *See Shrader*, at 257 ("[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided."). Nonetheless, I briefly address Doe's arguments below.

"The ADA prohibits discrimination against a 'qualified individual on the basis of disability' in the 'terms, conditions, and privileges of employment.'" *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting 42 U.S.C. § 12112(a)). In order to establish a claim for disability discrimination under the ADA, the plaintiff must show: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability." *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005); *Young v. Precision Metal Prods*, 599 F. Supp. 2d 216, 224 (D. Conn.

---

[2] As noted above, I also granted summary judgment in favor of the defendant on the section 31-51q claim. However, Doe does not seek reconsideration of that aspect of my ruling.

5

2009). "While Connecticut courts apply the same standards under the ADA to analyze CFEPA disability claims, Connecticut courts have interpreted CFEPA's definition of 'disability' to be significantly broader than the ADA's definition of 'disability' because CFEPA does not require that the chronic impairment 'substantially limit' a major life activity." *Martinez v. Connecticut State Library*, 817 F. Supp. 2d 28, 55-56 (D. Conn. 2011) (citing *Grunberg v. Quest Diagnostics, Inc.*, 2008 WL 323940, at *4 n.2 (D. Conn. Feb. 5, 2008)).  Under either claim, however, the plaintiff must still show causation:  that she suffered an adverse employment action *because of* her disability or perceived disability.  *See Capobianco*, 422 F.3d at 56.

ADA and CFEPA claims are analyzed using the burden-shifting paradigm articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2006) ("Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas.*"); *Martinez*, 817 F. Supp. 2d at 55 (stating that the same analysis applies to CFEPA claims).  Under this analysis, the plaintiff first bears the burden of setting out a prima facie case of discrimination.  *McBride*, 583 F.3d at 96.  If the plaintiff demonstrates a prima facie case, then a presumption of unlawful discrimination arises, and the burden shifts to the defendant, who is required to offer a legitimate, nondiscriminatory reason for its actions.  *Id.*  If the defendant offers such a rationale, the presumption of unlawful discrimination drops out and the burden shifts back to the plaintiff who must introduce admissible evidence that would permit a fact finder to infer that the defendant's employment decision more likely than not resulted from discrimination.  *Id.*

Here, as part of her prima facie case, Doe had to show that she suffered an adverse employment action because of her disability or perceived disability.  During the summary

6

judgment hearing, I ruled that, even if Doe could establish that she suffered from a disability within the meaning of the ADA[3] or the CFEPA, she failed to come forward with sufficient facts from which a reasonable juror could conclude that the plaintiff was fired *because of* her disability or perceived disability.  The plaintiff argues that this was error and that evidence was submitted from which a reasonable juror could conclude otherwise.

   Doe argues that Fectau's knowledge regarding her thyroid condition and its connection with her mood was sufficient to support a prima face case for disability discrimination.  Although it is true that a plaintiff may establish a prima facie case by showing she was fired "because of" manifestations of her disability, *see Hogarth v. Thornburgh*, 833 F. Supp. 1077, 1085 (S.D.N.Y. 1993), Doe did not submit evidence to suggest that the specific conduct for which she was terminated was, in fact, a manifestation of her thyroid condition.  According to Doe's own admission, the symptoms of her thyroid condition included extreme fatigue, depression, bad skin, hair loss, constipation, anxiety, heart palpitations, sweats, shaking, intestinal distress, and crying jags.  *See* Jane Doe Dep., at 32, attached as Ex. 1 to Pl.'s Opp'n to Summ. J. (doc. # 37).  On the day that Doe received news of her nephew's discipline and suffered her alleged "thyroid storm," she very well may have experienced crying jags as well as anxiety.  But it is undisputed that Doe's behavior that day involved more than a mere emotional breakdown:  Doe admits that she threatened her supervisor and later breached the school's

---

[3] The plaintiff argues that I overlooked the ADA Amendments Act.  Specifically, Doe argues that I overlooked her argument that she was "regarded as" disabled within the meaning of 42 U.S.C. § 12102(a)(1)(C).  For purposes of this motion, I accept that Doe was "disabled" within the meaning of 42 U.S.C. § 12102(a)(1)(A).  Whether Doe is "regarded as" disabled under 42 U.S.C. § 12102(a)(1)(C) or is disabled within the meaning of 42 U.S.C. § 12102(a)(1)(A) is irrelevant, however, because Doe presented insufficient evidence that she was fired *because of* her disability.

confidentiality policy.  Doe pointed to no evidence suggesting that threats and insubordination were somehow symptomatic of her thyroid condition.  Nor has Doe demonstrated that she could otherwise perform the essential functions of her job as a campus security officer—there is no reasonable accommodation for a medical condition that causes an employee to threaten physical harm to co-workers and knowingly breach school policy, particularly when that employee is charged with ensuring campus safety.  As a result, Doe cannot show that she was fired due to manifestations of her disability.[4]

Even assuming, *arguendo*, that Doe could demonstrate a prima facie case for disability discrimination under the ADA and/or CFEPA, the defendant has offered two legitimate, nondiscriminatory reasons for Doe's termination: threatening a supervisor and breaching confidentiality.  Both justifications are legitimate, nondiscriminatory reasons for an employee's termination.  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 170 (2d Cir. 2006) (holding that terminating an employee for making a physical threat constitutes a legitimate, nondiscriminatory reason for an employee's termination); *Lytle v. JPMorgan Chase*, 2012 WL 393008, at *22 (S.D.N.Y. Feb. 8, 2012) (holding that a refusal to comply with the requirements of one's employment is a legitimate, nondiscriminatory reason for termination).  Thus, in order to survive summary judgment, Doe was required to show that the proffered nondiscriminatory reasons for her termination were pretext for discrimination.  *McBride,* 583 F.3d at 96.

To establish pretext, the plaintiff must "either directly . . . persuade the court that a

---

[4] To the extent Doe is asserting a failure to accommodate claim, it fails for the same reason.  Doe cites *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994), for the proposition that a "failure to consider the possibility of reasonable accommodation for such disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to discharge solely because of the disabilities."  However, Doe has not demonstrated that her verbal outburst resulted from her disability, and thus she cannot show that she was discharged "for performance inadequacies *resulting from* the disabilities." *Id*.  (emphasis added).

discriminatory reason more likely motivated the defendant or indirectly . . . show that the defendant's proffered explanation is unworthy of credence." *Weiss v. JP Morgan Chase & Co.*, 332 Fed. App'x 659, 661 (2d Cir. 2009) (quoting *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1113 (2d Cir. 1988)).  Here, Doe principally argued that there were other similarly situated employees who were treated differently.  Doe could not, however, point to any other NFA employee who both disregarded commands to keep information confidential *and* threatened another employee but was not subjected to termination.  Given the absence of comparators, I concluded that Doe could not carry her ultimate burden of demonstrating that the defendant's stated reasons were pretext for discrimination.  In her motion for reconsideration, Doe has not come forward with any new evidence or any intervening change in controlling law that I overlooked in making this determination.  Thus, I find no reason to alter my previous ruling.

**IV.**    **Conclusion**

For the reasons stated above, Doe's motion for reconsideration (doc. # 51) is DENIED.  It is so ordered.

Dated at Bridgeport, Connecticut, this 31st day of October 2012.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge